# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **JANET L. RUSCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 700** |
| v. | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,[1]** | ) | |
| | ) | |
| **Defendant.** | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Janet Rusch brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"), 42 U.S.C §§ 416 and 423, and Supplemental Security Income ("SSI"), 42 U.S.C. § 1381a. (Compl.) [Dkt 1.] Plaintiff moved for summary judgment [dkt 11] and filed a supporting memorandum (Pl.'s Mem.) [dkt 12]. The Commissioner filed a cross-motion for summary judgment [dkt 16] with a memorandum in support (Def.'s Mem.) [dkt 17]. The parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). [Dkt 6.] For the reasons set forth below, Plaintiff's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

1

# PROCEDURAL HISTORY

On October 27, 2009, Plaintiff filed a DIB claim alleging disability since June 30, 2005. (R. 268-69.) On November 18, 2009, Plaintiff filed an SSI claim alleging disability since June 1, 2005. (R. 270-74.) Both dates were subsequently amended to March 12, 2007. (R. 67.)[2] Plaintiff claimed that she was disabled due to anxiety, panic attacks, heart arrhythmia, and herpes. (R. 519.) After her claim was denied, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 3, 2011. (R. 64 -106.) Plaintiff personally appeared and testified at the hearing and was represented by counsel. Medical expert Dr. Mark Oberlander, Ph.D., and Vocational Expert Aimee Mowery testified, along with three other witnesses. (*Id.*)

On June 30, 2011, the ALJ issued a partially favorable decision, finding that Plaintiff was disabled under the Act beginning January 13, 2010, but not before that date. (R. 112.)[3] Plaintiff filed a request for an appeal. (R. 216-17.) The Appeals Council vacated the portion of the decision that found Plaintiff was not disabled prior to January 13, 2010, and ordered another hearing and further consideration. (R. 112-15.)

On August 8, 2012, a second administrative hearing was held before the same ALJ. (R. 31-63.) Plaintiff again personally appeared and testified at the hearing and was represented by counsel. (*Id.*) Vocational expert Kari Seavers also testified, along with two other witnesses. (*Id.*) On September 28, 2012, the ALJ again denied Plaintiff's claims for DIB and SSI for the period of March 12, 2007 to January 12, 2010, finding her not disabled under the Act. (R. 9-23.) The Appeals Council denied Plaintiff's request for review on December 4, 2013 (R. 1-6), leaving the ALJ's

---

[2] Plaintiff's last date for insured status for SSI was March 31, 2008. (R. 16.)

[3] That opinion is apparently not in the Administrative Record.

decision as the final decision of the Commissioner and, therefore, reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## BACKGROUND

At the June 3, 2011 hearing, Plaintiff testified that she was 52 years old, married, and living with her husband and two of their seven children. (R. 68-69, 82) She testified she was disabled since March 12, 2007, and had not worked since that time. (R. 69.) She worked for a one-week period in 2008 for an allergy doctor, but was unable to continue because of her anxiety and concentration problems. (R. 69-70.) She previously worked as a teacher's aide, at a hospital, and at a clothing store. (R. 71, 86.) She was fired from all three jobs for absenteeism. (R. 87.) She was unable to work because of her anxiety and panic attacks. (R. 79-80.) During her anxiety and panic attacks, she would feel warm, scared, and as though she was not present. (R. 96.) She had panic attacks four or five times per day. (R. 80.) Over time, Plaintiff's symptoms worsened under stress and when she was around many people. (*Id.*) She believed she had anxiety her entire life. (*Id.*) She was seeing a counselor and had been taking anxiety medication for ten years. (*Id.*)

From the time she was 15 years old, she reported her symptoms to her primary care physician, Dr. Carbon. (R. 88.) Dr. Carbon treated Plaintiff with medication until he retired and transferred his practice to Dr. Palutsis. (R. 81, 89.) Dr. Palutsis referred Plaintiff to a psychiatrist, Dr. Timothy M. Cullinane, who referred Plaintiff to a licensed counselor, Anne Benson-Wleklinski. (R. 81, 93.) Plaintiff was afraid to seek professional help because she was embarrassed and felt safe with Dr. Carbon. (R. 89.) Dr. Wleklinski prescribed Plaintiff medication in addition to the medication she was taking. (R. 81.) When Plaintiff had anxiety attacks, most of the time she was

in a closed room or around many people; however, sometimes she had attacks while alone. (R. 90.) She always kept the door open at home and felt comfortable there. (*Id.*) However, sometimes she had to leave her home and go out. (*Id.*) She also kept the lights on at all times, and was not comfortable with the dark. (R. 97.) At times, it was difficult to have visitors. (R. 96.)

Plaintiff was also diagnosed with herpes and an irregular heartbeat at least 15 years ago. (R. 81-82.) The herpes outbreaks occurred often and when she was anxious, and there were few periods of remission. (R. 81-82, 94.) The outbreak was located on her left buttock and caused a rash followed by blisters. (R. 94.) She would experience pain from her left eye all the way down her left side and nausea. (*Id.*) Most of the time, the outbreak lasted two to three weeks, and it was hard to sit or get dressed due to the pain. (R. 95.) She saw six different doctors about her outbreaks and her physician recommended she seek treatment at the Mayo Clinic. (*Id.*) However, she could not go because she was scared. (*Id.*) She took Ativan, Zoloft, and Toprol XL[4] for her ailments, and the medications sometimes made her feel groggy. (R. 82.) She was able to take care of herself and her home. (R. 83.) She was able to drive, and sometimes would drive her car alone to the store. (*Id.*) She occasionally attended church, but was not active in social groups and would not dine out with family or friends. (*Id.*) Previously, she dined out once a week with family and friends; however,

_____

[4] Ativan is a "trademark for preparations of lorazepam," which is "used in the treatment of anxiety disorders and short-term relief of anxiety symptoms and as a sedative-hypnotic agent." *Dorland's Medical Dictionary* http://www.dorlands.com (last visited Jan. 20, 2016) [hereinafter *Dorland's*].

Zoloft is a "trademark for preparations of sertraline hydrochloride" which is "used to treat depressive, obsessive-compulsive, and panic disorders." *Dorland's*.

Toprol-XL is a "trademark for a preparation of metoprolol succinate), which is "the succinate salt of metoprolol, used for the treatment of angina pectoris and hypertension." *Dorland's*

most of those times she would leave.  (R. 86.)

In 2010, Plaintiff's symptoms worsened.  (R. 83.)  When dining out she would have to leave because she was scared.  (*Id.*)  Plaintiff's physician did not change her medication and attempted to teach her coping techniques, such as rubbing the beads of a rosary and saying a little prayer.  (R. 84, 96.)  Plaintiff enjoyed bowling and joined a league; however, most of the time she pre-bowled without the other bowlers.  (R. 84-85.)  She did not do many other activities.  (R. 84.)  Mostly, her day consisted of cleaning or doing laundry.  (*Id.*)  She did not read because she could not concentrate.  (R. 93.)  She watched television for fun, but could not sit and watch a television program for long because she would get weird feelings that caused her to get up and move.  (R. 90-91.)  She also felt those feelings while working.  (R. 91.)  When shopping, she did so with a list and with the aid of her husband or children.  (R. 91-92.)  Most of the time, she would leave them in the store to finish the shopping and, on occasion, she left the store in the middle of buying things.  (R. 91-92.)  In the past five years, she never had a whole week or five days in a row where she felt fine.  (R. 92.)

**Medical History**

There are treatment notes in the record extending back to September 12, 1981.  (R. 728.)  Although many of the notes lack detail, they evidence problems over the years, with the earliest evidence of Plaintiff's irregular heart beat dating back to August 9, 1996.  (R. 724-26.)

On January 17, 2006, cardiologist Dr. Donald J. Tanis, wrote to Plaintiff's primary physician, Dr. Patrick Carbon.  (R. 700-01.)  Dr. Tanis stated that he examined Plaintiff for a follow-up regarding her palpitations and frequent ventricular ectopy.  (R. 700.)  Plaintiff complained of

increasing fatigue, occasional episodes of palpitations, and a few dizzy spells. (*Id.*) Plaintiff took Toprol-XL 25mg daily and Ativan "for p.m. use," however, Plaintiff never took the magnesium oxide he recommended for her premature ventricular contractions. (*Id.*) Dr. Tanis dropped the Toprol-XL to 12.5 mg once daily, and indicated that he would arrange for an exercise stress test to be performed while Plaintiff was on the beta-blocker. (R. 701.)

On April 28, 2006 and March 16, 2007, Plaintiff was examined by Dr. Paul O'Keefe and Dr. Priya Priyadarsshini for management of her recurrent herpes. (R. 510- 15.) On April 28, 2006, the doctors noted that Plaintiff had recurrent herpes infection for the last seven years, with three episodes per year, and the last one occurring one year before. (R. 511.) Dr. O'Keefe prescribed Plaintiff acyclovir prophylaxis for her symptoms. (*Id.*) On March 16, 2007, Dr. O'Keefe recorded that she had three outbreaks within a month, and the last outbreak caused pain in her left eye and pain on the left side of her body, with headaches. (R. 510.) She could not tolerate either valacyclovir[5] or acyclovir[6] because she experienced side effects when taking them. (*Id.*) Plaintiff had normal heart sounds and heart rate. (*Id.*)

On June 5, 2006, Dr. Tanis wrote to Dr. Carbon regarding Plaintiff's follow-up visit. (R. 702-03.) Plaintiff complained that she had been under a lot of stress because she had two deaths in her family, along with other events. (R. 702.) She had not slept well, and had significant

---

[5] Valacyclovir is the hydrochloride salt of the l-valyl ester of acyclovir, which is used as an antiviral agent in the treatment of genital herpes and herpes zoster in immunocompetent adults. *Dorland's.*

[6] Acyclovir is "a synthetic acyclic purine nucleoside with selective antiviral activity against herpes simplex virus (types 1 and 2, human herpesvirus 3, Epstein-Barr virus, and cytomegalovirus," which is used in the treatment of genital and mucocutaneous herpesvirus infections in certain patients, both immunocompromised and nonimmunocompromised. *Dorland's.*

palpitations on June 2, 2006, which lasted much longer than normal. (*Id.*) Dr. Tanis noted that Plaintiff's symptoms were quite minimal and seemed better with the higher dose of Toprol that she had recently been taking. (*Id.*) Dr. Tanis also indicated that Plaintiff's past fatigue improved with lower doses of beta-blocker; however, she needed some dose of beta-blocker to alleviate her symptoms. (R. 703.) Dr. Tanis increased Plaintiff's Toprol to 25 mg daily, and advised Plaintiff to monitor whether she could reduce the dosage. (*Id.*)

On October 2, 2006, Dr. Tanis noted that Plaintiff had fewer palpitations on low dose beta-blockade; however, she had a fairly prolonged episode of palpitations while walking up a hill. (R. 704.) Dr. Tanis noted that Plaintiff's palpitations may have resulted from either supraventricular tachycardia or ventricular arrhythmias. (R. 705.) Plaintiff's previous Holter monitors[7] showed premature atrial and ventricular complexes, and although she improved with beta-blocker, it did not eliminate her symptoms. (*Id.*) Dr. Tanis also noted that Plaintiff was now afraid to go out of the house alone and that she was threatened by the arrhythmia. (*Id.*) Dr. Tanis advised Plaintiff to undergo a repeat echocardiogram and Holter monitor, and explained Valsalva maneuvers[8] to use in the event and episode occurred. (*Id.*)

On October 9, 2006, Plaintiff underwent a Holter monitor and echocardiogram. (R. 525-28.) The Holter monitor was abnormal, with one episode of five beats of supraventricular tachycardia that

---

[7] A Holter monitor is an ambulatory ECG monitor, which is "used to detect the frequency and duration of cardiac rhythm disturbances and to assess pacemaker programming." *Dorland's.*

[8] A Valsalva maneuver is the "forcible exhalation effort against a closed glottis; the resultant increase in intrathoracic pressure interferes with venous return to the heart." Called also Valsalva experiment, "[the] forcible exhalation effort against occluded nostrils and a closed mouth causes increased pressure in the eustachian tube and middle ear, so that the tympanic membrane moves outward; formerly used as a test of eustachian tube patency." *Dorland's.*

was somewhat irregular not suggestive of atrial fibrillation, but symptomatic with palpitations. (R. 525.) The symptoms of palpitations correlated with the arrhythmia. (*Id.*) The echocardiogram was mildly abnormal. (R. 528.) The mitral valve leaflets were normal without evidence of prolapse, but there was trivial to mild mitral regurgitation into a normal sized left atrium measuring 34mm. (*Id.*) There was also moderate tricuspid regurgitation into a mildly dilated right atrium with estimated PA systolic pressure in the upper normal range at about 29m/Hg. (*Id.*) Compared to the prior study completed on January 24, 2002, the right atrium now appeared mildly enlarged and the degree of the tricuspid regurgitation was more advanced. (*Id.*)

On February 20, 2007, cardiologist Dr. Kousik Krishnan wrote to Dr. Tanis about his examination of Plaintiff. (R. 711-12.) Dr. Krishnan stated that Plaintiff had been doing well with her Toprol and her only new complaint was cold air-induced asthma. (*Id.*) Plaintiff had palpitations, possibly supraventricular tachycardia ("SVT"), and shingles. (R. 712.) Dr. Krishnan discussed with Plaintiff the possibility of doing an electrophysiology to determine the source of her SVT, and ablation therapy. (*Id.*)

On March 12, 2007, Dr. Tanis informed Dr. Carbon that Plaintiff decided not to pursue electrophysiology or ablation therapy. (R. 709.) Plaintiff only had rare palpitations and no recent prolonged episodes. (*Id.*) She was concerned about her high cholesterol and was advised of a low cholesterol diet. (*Id.*)

On April 19, 2007, Plaintiff was examined at Elmhurst Memorial Hospital. She complained of excessive menstrual bleeding. (R. 795.) On April 24, 2007, she underwent a pelvic ultrasound for her dysfunctional bleeding. (R. 788-91.) The ultrasound indicated that Plaintiff had no uterine fibroids or endometrial polyps; however, Plaintiff's uterus was retroverted with small nabothian

cysts in her cervix. (R. 790.) On August 17, 2007, Plaintiff again complained of excessive menstrual bleeding, and stated that she felt palpitations. (R. 794.) She was advised to increase her fluids and rest. (*Id.*)

On September 24, 2007, Dr. Tanis indicated that Plaintiff was doing well clinically. (R. 708.) Plaintiff had palpitations under stress, but had no prolonged or severe episodes. (*Id.*) Dr. Tanis noted that Plaintiff had paroxysmal supraventricular tachycardia and that it was quite stable on Plaintiff's current low dose of Toprol. (*Id.*) Dr. Tanis recommended that Plaintiff continue her Toprol at 12.5 mg daily and her Ativan as needed for her anxiety. (*Id.*)

On May 20, 2008, Dr. Tanis noted that Plaintiff was recently diagnosed with some type of growth on her right foot. (R. 713.) Plaintiff had palpitations more often that were worse than in the past, and one episode where she had difficulty breathing. (*Id.*) She attempted to break the episodes with Valsalva maneuver to no avail. (*Id.*) She occasionally took an extra dose of metoprolol which helped to some extent. (*Id.*) Dr. Tanis indicated that the increase in episodes were likely due to stress. (*Id.*) Dr. Tanis advised Plaintiff to continue her current dosage of Toprol-XL at 25 mg once daily and her Ativan as needed. (R. 714.) Dr. Tanis also advised Plaintiff she could have a magnetic resonance angiography but, he noted, Plaintiff may need an open MRI because she tended to be claustrophobic. (*Id.*)

On September 18, 2008, Plaintiff returned to Elmhurst Memorial Hospital, again complaining of excessive menstrual bleeding. (R. 793.) Plaintiff also complained of feeling weak and heart palpitations. (*Id.*) On October 23, 2008, Dr. Tanis wrote that Plaintiff still had palpitations, which occurred more frequently around the time of Plaintiff's menstrual periods and with vigorous exercise. (R. 715.) Plaintiff exercised vigorously and improved her diet therapy for her

hyperlipidemia. (*Id.*) She had no further prolonged episodes and was stable on her low dose Toprol-XL. (*Id.*) Plaintiff refused to take Crestor for her hyperlipidemia. (R. 715.) On December 22, 2008, Plaintiff returned to Elmhurst Memorial Hospital, again complaining of vaginal bleeding and lower pelvic discomfort. (R. 793.) On February 26, 2009, Dr. Tanis wrote that from a cardiac standpoint, Plaintiff was doing quite well clinically. (R. 717.) Plaintiff had occasional palpitations when she exercised and no prolonged episodes or recurrent dizziness. (*Id.*)

In December 2009, both Plaintiff and her husband completed a function report describing her limitations. (R. 359-68, 386-94.) Plaintiff also completed a Physical Impairment Questionnaire ("PIQ"). (R. 370-71.) Plaintiff and her husband stated that when Plaintiff was able, her day consisted of cleaning the house, washing dishes, running errands, doing laundry, watching television, cooking, shopping two to three times per week, and picking up their daughter from school. (R. 361, 363-64, 388, 390-91.) They wrote that Plaintiff could not stand in long lines at stores, could not socialize with many people or be in small spaces, and could not take vacations any longer because of her anxiety. (R. 362, 389.) She had trouble sleeping because of her heart palpitations and sometimes she needed help remembering to take her medications. (R. 363, 389.) She liked to bowl, but could no longer because it created stress and anxiety. (R. 365, 391.) Crowded places were a problem for her and it was hard to be around others, which caused her to leave events abruptly. (R. 366, 392.) Plaintiff's condition caused her to experience memory, concentration, and talking problems. (*Id.*) Plaintiff indicated that she was able to handle changes in her routine, unless dramatic, and her husband indicated that she did not really like changes in her routine because she feared an anxiety attack would result. (R. 367, 393.) Plaintiff indicated on the PIQ that she sometimes experienced fatigue if she had a bad panic attack or herpes outbreak. (R. 371.) She also

indicated she was not able to sit for at least two hours because she had to stand every fifteen to twenty minutes to prevent an anxiety attack or control one. (*Id.*) She also needed a rest period every thirty to forty-five minutes to stop and pray to relax. (*Id.*)

On January 13, 2010, Plaintiff was examined by consultative psychologist, Dr. John R. Brauer. (R. 531-34.) Plaintiff reported frequent and intense anxiety attacks for the past five years that worsened considerably during the past two years. (R. 531.) She also reported painful herpes outbreaks when her anxiety attacks worsened, causing approximately one month of painful outbreaks on her left buttock. (*Id.*) She was very anxious about her anxiety attacks in front of others, and the embarrassment it caused, leading her into a pattern of not going out very often. (*Id.*) During the mental status examination, Plaintiff's affect was tearful and anxious, with clear, logical, and sequential speech. (R. 533.) Plaintiff's concentration and attention appeared to be within normal limits and her general fund of knowledge grossly intact. (*Id.*) Plaintiff had grossly appropriate judgment and her abstraction was reasonably well-developed. (*Id.*) Dr. Bauer diagnosed Plaintiff with panic disorder with agoraphobia and major depression. (R. 534.)

On January 26, 2010, Dr. Philip S. Palutsis, Plaintiff's treating physician, wrote an assessment regarding Plaintiff's impairments. (R. 568.) Dr. Palutsis stated that Plaintiff had been a patient at his medical office for many years, initially under Dr. Carbon's care, and upon Dr. Carbon's retirement, with Dr. Palutsis. (*Id.*) Plaintiff had been treated for severe anxiety and panic disorder since at least 1987, and had received various medications and counseling through his office. (*Id.*) Dr. Palutsis concluded that the severity of Plaintiff's disorder considerably limited her social and employment interactions. (*Id.*)

On March 5, 2010, Dr. W. Nordbrock, a non-examining consultative psychologist, completed

a psychiatric review technique form ("PRTF") and a Mental Residual Functional Capacity ("RFC") Assessment. (R.799-815.) The PRTF was from June 30, 2005 to March 5, 2010. (R. 799.) Dr. Nordbrock assessed Plaintiff under the category listing: 12.06, anxiety-related disorders. (*Id.*) Under the "B" criteria of the listing, Dr. Nordbrock indicated that Plaintiff had mild limitations in her activities of daily living and maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace. (R. 809.)

On the Mental RFC Assessment, Dr. Nordbrock indicated that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, moderately limited in her ability to carry out detailed instructions, moderately limited in her ability to maintain attention and concentration for extended periods, and moderately limited in her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 813-14.) Plaintiff was also moderately limited in her ability to respond appropriately to changes in the work setting, and moderately limited in her ability to travel in unfamiliar places or use public transportation. (R. 814.) Dr. Nordbrock concluded that Plaintiff was partially credible because her allegations appeared to be somewhat more severe than what would be supported by the medical evidence of record, and that although the medical evidence of record established that Plaintiff had a severe medically determinable impairment, it would not preclude her from doing "SRT." (R. 816.)

On June 1, 2010, Dr. Carbon wrote an assessment of Plaintiff's impairments. (R. 818.) Dr. Carbon stated that he had treated Plaintiff since the 1980's, and last treated her in the spring of 2009. (*Id.*) Plaintiff had problems with her heart, reoccurrence of shingles, depression, anxiety, and panic disorder for many years. (*Id.*) Dr. Carbon also indicated that Plaintiff lost several jobs because of

12

her inability to work and that she reported restricting her social activities, where she shopped, and how far home she could travel. (*Id.*) Plaintiff also reported severe anxiety, palpitations, sweating, and shortness of breath, mood swings, and various stress-related symptoms. (*Id.*) Dr. Carbon stated that he prescribed Plaintiff medication and talked with her, and that in the last years of treatment Plaintiff reported panic attacks as often as three to four times per week. (*Id.*) He concluded that Plaintiff had "always given a best effort despite the difficulties she has on a daily basis." (*Id.*)

On May 26, 2011, Licensed Counselor Ann Benson-Wleklinski wrote an assessment regarding Plaintiff's symptoms. (R. 960-61, 1049.) Ms. Benson-Wleklinski indicated that she began treating Plaintiff on May 13, 2010. (R. 960.) Plaintiff presented with panic attacks and depression, and reported having anxiety since childhood. (*Id.*) Plaintiff's mother, brother, aunt, and three of her children also suffered anxiety. (*Id.*) Ms. Benson-Wleklinski indicated that Plaintiff had previously seen psychiatrist Dr. Cullinane, but no longer saw him because she resisted taking antidepressants. (*Id.*) Plaintiff did well in therapy; however, she still had severe symptoms. (*Id.*) She had periods of depression that prohibited her from working full-time and frequently was tearful and shaky at home and while shopping. (*Id.*) Ms. Benson-Wleklinski noted that Plaintiff had her condition for many years, and Ms. Benson-Wleklinski was unable to state how much she could improve. (*Id.*)

On January 13, 2011 and on November 15, 2011, Dr. Palutsis wrote two more assessments. (R. 905-06, 986.) By then he had treated Plaintiff for more than five years, initially on a limited basis when Dr. Carbon was not available. (R. 905.) Dr. Palutsis stated that there was nothing in Plaintiff's notes that would explain the anxiety she goes through. (R. 905.) Dr. Palutsis noted that when Plaintiff came for appointments she would pace around the waiting room, and if she was not able to be seen right away she would leave and reschedule. (*Id.*) In addition to the symptoms

noticed at the office, Plaintiff reported panic attacks which occurred under stressful situations and other attacks that occurred without warning. (R. 906.) The majority of the time, Plaintiff's requests for help centered on her anxiety, and any stress enhanced the possibility of her anxiety attacks. (*Id.*) Plaintiff's herpes and Paroxysmal supraventricular tachycardia were exacerbated by her anxiety. (*Id.*) Dr. Palutsis also indicated that Plaintiff attempted to maintain a front for everyone because she did not want others to know that she was incapable of going many places. (*Id.*) Dr. Palutsis stated that Dr. Carbon counseled and gave medication to Plaintiff rather than referring her to a specialist because he tended to treat all ills and Plaintiff was comfortable with him. (*Id.*) When Dr. Palutsis took over her treatment he encouraged her to pursue other professional help but she was very nervous and uncomfortable. (*Id.*) She would not return to the first doctor she saw because she was too anxious. (*Id.*)

In his second letter, Dr. Palutsis went further. Plaintiff's anxiety, he said, "was and continues to be relentless." (R. 986.) He explained that trying to get her to see a doctor for her medical conditions (heart and herpes) was "a struggle" because of her anxiety. (*Id.*) He and Dr. Carbon treated her for anxiety but did not document it. (*Id.*) Instead, they dealt with it from a medical standpoint with medication. (*Id.*) Dr. Palutsis concluded:

> I don't think it is clear to the agency how paralyzing her anxiety could be. It is truly unfortunate that she did not have more specific notes but after years of trying to get her to go to a professional for help it is clear that the very symptoms of the diagnosis were what prevented her from treatment.

(*Id.*)

**Administrative Hearing held on June 3, 2011**

In addition to Plaintiff's testimony described above, a number of other witnesses testified for Plaintiff. Medical and vocational experts also testified.

Annie Suchan, Plaintiff's family friend, testified that she had known Plaintiff for over ten years. (R. 72.) During this time, she observed Plaintiff's panic and anxiety problems. (*Id.*) Ms. Suchan stated that Plaintiff would get really shaky and move back and forth. (*Id.*) Plaintiff could not concentrate, did not focus, and became sweaty. (*Id.*) A person could tell by Plaintiff's face that "she's not occupied on you and that she's just was having anxiety." (*Id.*) Almost every time Ms. Suchan was with Plaintiff, she could feel Plaintiff being anxious or panicked. (R. 73.) During the attacks, Plaintiff would become very unresponsive and would go for a walk or to the bathroom to get away from people. (*Id.*) Also, when Plaintiff went to the restroom she would leave the door open. (*Id.*)

Sharon Rizzo, Plaintiff's first cousin, testified that she had known Plaintiff her whole life. (R. 74.) She stated her recollection was similar to Ms. Suchan's and that she had witnessed Plaintiff taking medication. (R. 75.) She stated that Plaintiff recently started carrying a rosary, went to church, and prayed a lot. (*Id.*) From June of 2007 thorough 2011, Ms. Rizzo witnessed Plaintiff become anxious about four or five times per week. (*Id.*)

Anthony Hugelier, Plaintiff's son, testified that his recollection was very similar to that of Ms. Suchan and Ms. Rizzo. (R. 77.) He previously worked with Plaintiff part-time at summer school. (R. 78.) They rode from work together, and about twenty to twenty-five percent of the time, Plaintiff had to leave early or had an attack, leaving Mr. Hugelier without a ride home. (*Id.*) Mr. Hugelier stated that Plaintiff tried her best to attend significant school activities for her children.

(*Id.*)  At his sister's graduation, Plaintiff's husband and Mr. Hugelier reserved the seat near the door to allow Plaintiff easy access if she needed to leave.  (*Id.*)  During the ceremony, Plaintiff took several breaks and only watched her daughter walk across the stage.  (R. 79.)

Medical Expert

Dr. Mark Oberlander, M.D. testified that he reviewed the documents in evidence and heard all of the previous testimonies.  (R. 98.)  Dr. Oberlander believed that symptom severity equaled listing level; however, he had some issues with the onset date.  (R. 99.)  Dr. Oberlander did not find any substantial acceptable medical evidence going back to the newly alleged onset date of March 16, 2007; however, he found substantive evidence from January 13, 2010.  (*Id.*)  It was his opinion that the medical evidence starting with the consultative exams in 2010 forward indicated the presence of Plaintiff's psychiatric disorders under three different Social Security listings: 12.04, major depressive disorder; 12.06, in the A criteria of the psychiatric review technique; and 12.07, somatoform disorders.  (*Id.*)

Dr. Oberlander stated that from January 13, 2010 forward, the following functional impairments would have been present: Plaintiff's functional limitation and capacity to engage in appropriate activities of daily living were mildly impaired; social interaction markedly impaired; and attending, concentrating, acting with persistence uniquely so in a work setting markedly impaired. (R. 100.)  Dr. Oberlander stated that there was insufficient evidence as to any periods of decompensation or deterioration.  (*Id.*)  Dr. Oberlander also stated that prior to January 13, 2010, there was not enough psychiatric information in the record regarding functionality to allow him to exercise professional responsibility advising the ALJ on Plaintiff's mental RFC.  (R. 102.)  He noted

16

some of the non-psychiatric contacts that she had with treating sources; specifically, as to the possibility that some of the cardiac problems that she reported in the emergency room were anxiety attacks or anxiety related, but, he said, any speculation on his part as to Plaintiff's capacity would not be professionally responsible.  (R. 102-04.)

Vocational Expert

Vocational Expert ("VE") Aimee Mowery testified.  (R. 105.)  Plaintiff's attorney asked the VE whether a person would be able to work if she was unable to complete a normal workweek without interruptions from psychological symptoms at least twenty percent of the time.  (*Id.*)  The VE responded no, that would typically exceed employer tolerances for being off-task.  (*Id.*)

**Administrative Hearing held on August 8, 2012**

Plaintiff's Testimony

At the August 8, 2012 hearing, Plaintiff testified that she was fifty-three years old and that since the last hearing, her ailments and medications had not changed.  (R. 35-36.)  She stated that her previous physician, Dr. Carbon prescribed her medicine for her anxiety but never prescribed further treatment.  (R. 38.)  She did not see a specialist until Dr. Palutsis suggested it.  (R. 38-39.)  When she was anxious or panicky, she would get shaky and weak; and if she needed to get out of a situation she either left or became sick, feeling nauseous and dizzy.  (R. 39.)  She had recently attempted to dine out with her family, but was not able to sit through the meal.  (R. 40.)  She would feel claustrophobic and felt she needed to get out.  (*Id.*)  It had never been any different from 2007 until 2012.  (*Id.*)  In the past, she would not share her condition with others, she would say she was

sick or made excuses, but currently accepted her condition.  (*Id.*)  She tried to go out with family and sometimes could complete grocery shopping if she went with her list.  (*Id.*)  However, if the store was crowded she would leave and come back another time.  (R. 40-41.)

Between 2007 and the hearing, she could browse a little bit in stores, but only for fifteen minutes and around the outer parts of the stores.  (*Id.*)  She avoided certain parts of stores and checked for exits when she went in buildings.  (*Id.*)  When she worked as a teaching assistant, she was not able to spontaneously change her tasks.  (R. 42.)  If she was asked in such a manner, she would make excuses or leave the school.  (*Id.*)  If she was informed about field trips one day prior to the trip, she would call in sick.  (R. 43.)  She reiterated that she kept her home very clean, and that doing the dishes was routine and relaxing.  (*Id.*)  She also reiterated that she had problems with closed doors.  (R. 44.)  While using the restroom, she would leave the door open.  (*Id.*)  Sometimes, she had problems completing tasks or cooking because she thought too much.  (R. 44-45.)  If something was complicated she would not ask for assistance in stores or public places because she felt uncomfortable.  (R. 45.)  When going out, she usually took someone with her.  (R. 46.)  She did not babysit her grandchildren alone, because sometimes she would have to leave and did not want leave the children alone.  (R. 46-47.)  She still did not like the dark, and during nightfall, she did not go outside when the light changed because it had to be complete.  (R. 47.)  She was also very organized and if someone changed things that were to be a certain way it would upset her.  (R. 49.)

Annie Suchan's Testimony

Ms. Suchan again testified.  (R. 53-57.)  Ms. Suchan stated that since 2005 Plaintiff had become progressively worse.  (R. 53-54.)  She could not count on Plaintiff to come to an event, and

if Plaintiff came her appearance was brief. (R. 54) She also did not ask Plaintiff to babysit because Plaintiff always needed someone with her. (*Id.*) Ms. Suchan stated that change was hard for plaintiff and brought up "stress, anxiety, and all those kinds of things." (R. 55.) About once a week, Plaintiff and Ms. Suchan would attempt to go to lunch, however, more times than not it usually entailed seeing each other in the parking lot and not going inside. (R. 56.) If they made it inside, Plaintiff would leave if it was crowded, and often only stayed through the appetizer. (R. 56-57.)

### Anthony Hugelier's Testimony

Mr. Hugelier again testified. (R. 49-50.) He stated that the information he provided to the court in paper and in person during the previous hearing was substantially the same as it is now; however, since 2007, Plaintiff's symptoms had become progressively worse. (R. 50.)

### Vocational Expert

At the August 8, 2012 administrative hearing, Vocational Expert ("VE") Kari Seavers testified. (R. 58-59.) The ALJ asked the VE whether a person of younger age, limited to simple, routine tasks, could perform any of Plaintiff's past work. The VE responded, that she could not because all of the past work would have required more than routine tasks. (R. 59.) The ALJ then asked if there were other jobs that such a person could be expected to perform. (*Id.*) The VE responded that there would be hand packer, with 38,680 jobs in the local economy considered the Chicago Metropolitan region; assembler, with 20,770 jobs in the local economy; and sorter with 17,750 jobs in the local economy. (R. 59-60.) The ALJ then asked the VE whether her answer would change if the person also was precluded from work involving the public or more than

occasional contact with coworkers or supervisors, or precluded from work in confined spaces.  (*Id.*)  The VE responded that it would not.  (*Id.*)

The VE testified that if the ALJ were to fully credit Plaintiff's testimony, there would be no work Plaintiff could perform.  (*Id.*)  Under questioning from Plaintiff's attorney, the VE stated that a person who could not respond appropriately to changes in the workplace twenty percent of the time would not be able to work.  (R. 61-62.)  Similarly, if the person that was absent two to three times per month, the person would not be able to work because the person would be allowed to miss only up to one and three-quarter days per month.  (R. 62.)  Lastly, Plaintiff's attorney asked the VE whether a person that could attend work but would be distracted twenty percent of the time would be able to work.  The VE responded no.  (*Id.*).

### Disability Determination Process

Under the Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The ALJ must consider the following: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual

functional capacity ("RFC") to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a); *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one to four, and if that burden is met, at step five the burden shifts to the Commissioner to provide evidence that other work that the claimant can perform exists in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

### ALJ's September 28, 2012 Decision

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 30, 2005. (R. 16.) At step two, the ALJ concluded that Plaintiff had three severe impairments: major depressive disorder, panic disorder, and somatoform disorder. (*Id.*) At step three, the ALJ concluded that none of Plaintiff's impairments met or equaled the severity of a disability listing, but the ALJ only discussed listing 12.04 (affective disorders). (R. 17.) The ALJ then determined that Plaintiff had the RFC to work at all exertional levels but was restricted to work involving no more than simple, routine tasks. (R. 18.) At step four, the ALJ concluded that Plaintiff lacked past relevant work. (R. 21.) At step five, based upon the VE's testimony and Plaintiff's age, education, work experience, and RFC, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could have performed before her condition worsened, leading to a

finding that she was not disabled under the Act before January 13, 2010. (R. 21-22.)

## STANDARD OF REVIEW

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if reasonable minds could differ as long as the decision is adequately supported).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski*, 245 F.3d at 889. In cases where the ALJ denies benefits to a Plaintiff, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis

so that we can follow his reasoning . . . .").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a Plaintiff is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## DISCUSSION

At issue here is the ALJ's determination of Plaintiff's condition between March 12, 2007 and January 13, 2010. Plaintiff argues that this case should be reversed or remanded because the ALJ erroneously performed the Step Three analysis, the RFC determination, and the credibility analysis. (Pl.'s Mem. at 6-13.)

The ALJ's task here was not an easy one. He was required to evaluate Plaintiff's condition in a period two to five years earlier than the date of the second hearing, during a time when there are admittedly few records from mental health professionals documenting Plaintiff's mental health problems. However, the court concludes that remand is required.

To start, Plaintiff argues that the ALJ did not properly evaluate whether her conditions met or equaled a listed impairment, specifically taking issue with the ALJ's lack of consideration of her severe panic disorder, somatoform disorder, and cardiac issues under their corresponding listings. (Pl.'s Mem. at 6-9.) The Plaintiff also asserts the ALJ failed to use a special technique for mental

disorders, gave improper weight to treating physicians, and did not address Plaintiff's social functioning. (*Id.*)

At Step Three, an ALJ must consider whether a claimant's impairments meet or medically equal a listed impairment, either singly or in combination. 20 C.F.R. § 404.1520(a)(4)(iii). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). "Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990)). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (citing 20 C.F.R. § 416.926(a)(1989)) (emphasis in the original).

The ALJ here found that Plaintiff had the severe impairments of major depressive disorder, panic disorder, and somatoform disorder. (R. 16.) These severe impairments match listings in 20 C.F.R. Part 404, Subpart P, Appendix 1: major depressive disorder is included under the listing for affective disorders, 12.04; panic disorder is included under the listing for anxiety related disorders, 12.06; and somatoform disorder is included under the listing for somatoform disorders, 12.07. The ALJ, however, only explicitly discussed listing 12.04 in determining that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listing.

The Commissioner attempts to justify the ALJ's discussion by stating "[t]he ALJ was not

required to go through the medical evidence, pick out each condition mentioned, and determine if that condition met or equaled a listed impairment, particularly if those conditions were not alleged to be disabling or found to be severe." (Def.'s Mem. at 5.) While that statement is correct insofar as it is applied to "each condition mentioned" in the evidence, this case involves three specific impairments that were determined to be severe by the ALJ based on Plaintiff's evidence. That requires the ALJ to, at the very least, undertake an analysis under each severe impairment's corresponding listing. The ALJ must do more than determine Plaintiff's impairment did not meet or equal listing 12.04 to determine whether the Plaintiff was presumptively disabled. On remand, the ALJ must to discuss the relevant facts for each listing and make appropriate legal conclusions for each.

That is particularly important in this case because Dr. Oberlander, the medical expert in the initial hearing, testified that Plaintiff had listing level severity for all three disorders as of January 13, 2010. (R. 99-100.) Dr. Oberlander also testified, "[P]sychiatric symptoms do not occur out of the clear blue in a sudden fashion unless they're the direct result of identifiable trauma and other conditions." (R. 103.) There is no evidence of sudden trauma in Plaintiff's case that would cause a sudden onset of listing-level mental disorders. The ALJ suggests that Dr. Oberlander attributed the onset of Plaintiff's mental problems to "environmental factors present currently" (R. 18), but that was not his testimony. (*See* R. 104.) Instead, there is evidence of such disorders earlier than January 2010, and Dr. Oberlander noted that Plaintiff had been prescribed Ativan for anxiety "for some period of time." (*Id.*)

Dr. Oberlander had difficulty identifying the onset date of Plaintiff's disorders because of the paucity of mental health treatment records earlier than January 13 2010 (R. 98-103), the date of

Plaintiff's first consultative examination with clinical psychologist Dr. Brauer (R. 531). After the first hearing, Plaintiff's treating physician Dr. Palutsis wrote his second letter explaining why there are no earlier psychiatric treatment notes, that Plaintiff's anxiety prevented her from seeking treatment from a doctor other than Dr. Carbon, with whom she was comfortable and who treated Plaintiff's symptoms as a medical rather than psychiatric problem. (R. 986-87.) The ALJ effectively dismissed Dr. Palutsis's letter because he is "not a specialist in mental health but rather is a family practitioner." (R. 19.) That is the point of Dr. Palutsis's letter: he and Plaintiff's prior primary doctor treated her symptoms with medications because they are not mental health professionals.

The ALJ "particular[ly] note[d]" Dr. Cullinane's report even though that report was rendered after seeing Plaintiff only once. (R. 19, referring to R. 828-29.) Dr. Cullinane said that, based on Plaintiff's "first and only" visit with him, he did not believe she is disabled, but he also noted her report of symptoms that began "many years ago." (R. 828-29.) It is unclear how the ALJ could give significant value to Dr. Cullinane's conclusion when it is contrary to the ALJ's prior finding of disability based on Dr. Oberlander's testimony that by January 2010 Plaintiff had listing level severity impairments. Further, Dr. Cullinane reported that Plaintiff was to return in six weeks after the appointment on April 30, 2010, but as of the date of the report (June 10, 2010), she had not yet returned. (R. 828.) That is consistent with Dr. Palutsis's report in January 2011 that Plaintiff did not return to the first doctor to whom he referred her because she was "too anxious." (R. 906.)

A significant error in the opinion is the ALJ's discounting of Plaintiff's credibility because of what the ALJ characterized as a failure to seek mental health treatment. (R. 19) The ALJ cites Dr. Palutsis's second letter as saying that he had tried for many years to get Plaintiff to see a mental health professional. (*Id.*) The ALJ then concludes:

> [T]he failure of the claimant to seek professional treatment for her condition reflects adversely on her assertions that the condition was disabling during the period at issue. An individual having functional limitations of a disabling severity would be expected to comply with recommended treatment modalities to obtain relief.

(*Id.*) The ALJ missed an entire line of evidence when he failed to explore why Plaintiff did not seek treatment from mental health professionals.

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. . . . The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms.

SSR 96-7P.

Here, Plaintiff testified that she *had* been getting treatment and medication for her anxiety, but from her primary physician, not a mental health professional. (R. 80.) Dr. Palutsis explained:

> Dr. Carbon would counsel her and gave her medication. *I don't believe she was referred out to other doctors or therapists* as Dr. Carbon tended to treat all ills and Janet was comfortable with him. When I took over treatment I tried to make sure she pursues professional help from the appropriate medical sources.

(R. 906, emphasis added.) The ALJ ignored that evidence.

The ALJ's failure to consider that evidence is significant because the time period under consideration (2007-2010) was the time when Plaintiff was treated primarily by Dr. Carbon. The ALJ also failed to consider whether Plaintiff's anxiety itself "was and is a barrier to treatment," as Dr. Palutsis stated. (R. 986.) The ALJ should have considered this evidence before discounting Plaintiff for not seeking treatment from a mental health professional. "[A]n ALJ must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may

provide." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (citation omitted).

The ALJ also ignored evidence of Plaintiff's symptoms from Dr. Tanis's reports prior to 2010. For example, as early as June 2006, Dr. Tanis reported that Plaintiff is "very anxious" and he advised her to increase her Toprol. (R. 702.) In October 2006, he reported that Plaintiff had "a much more significant episode" of palpitations and that "she is now afraid to out of the house alone." (R. 705.) His report in May 2008 said that Plaintiff had more frequent palpitations that are worse when she is stressed, to the point where it was difficult for her to breathe. (R. 713.)

In summary, the ALJ failed to consider evidence in the record that contradicts the ALJ's conclusion that Plaintiff first became disabled on January 13, 2010, the date of her first consultative examination.

The ALJ gave "little weight" to Dr. Palutsis's opinion and instead gave "great weight" to the opinion of Dr. Oberlander, whom, the ALJ said, had the benefit of the reviewing the record in its entirety." (R. 20.) In fact, Dr. Oberlander did not have the benefit of Dr. Palutsis's second letter explaining why there were no mental health treatment records for the time Plaintiff was treated by Dr. Carbon, or the testimony at the second hearing. In this respect, it is important to note that Dr. Oberlander did not say that Plaintiff was not disabled prior to January 13, 2010, but rather he did not feel confident opining on that period based on the record he had at the first hearing. The ALJ erred in not seeking a medical opinion based the entire record, including the testimony at the second hearing and Dr. Palutsis's second letter.

On remand, the ALJ must set out an analysis at Step Three for each of the listings. If that does not result in a finding of disability at Step Three, the ALJ must also reconsider his credibility determination based on the evidence in the record, and if necessary, conduct a further hearing with

additional testimony by a medical expert.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Dkt. 11] is granted, and the Commissioner's cross-motion for summary judgment is denied. The case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. Judgement is entered in favor of the Plaintiff and against the Commissioner.

_Geraldine Soat Brown_
Geraldine Soat Brown
United States Magistrate Judge

Date: February 22, 2016